714 A.2d 317

SINGER ASSET FINANCE COMPANY, L.L.C., APPELLANT, v. STATE OF NEW JERSEY, DEPARTMENT OF THE TREA-SURY, DIVISION OF STATE LOTTERY, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued April 20, 1998—Decided May 14, 1998.

Before Judges LANDAU, COLLESTER and BILDER.

*Moira E. O'Connell,* argued the cause for appellant (*Catalano & O'Connell,* attorneys; *Edward B. Deutsch* and *James W. Gunson,* on the brief).

*Clifford T. Rones,* Deputy Attorney General, argued the cause for respondent (*Peter Verniero,* Attorney General, attorney; *Joseph L. Yannotti,* Assistant Attorney General, of counsel; *Mr. Rones,* on the brief).

The opinion of the court was delivered by

LANDAU, J.A.D.

This is an appeal taken by Singer Asset Finance Company, L.L.C. (Singer) under *R.* 2:2–3(a)(2) to review the validity of

amendments to the "Pick–6 Lotto" game rules adopted by the New Jersey State Lottery Commission (Commission) under the authority of *N.J.S.A.* 5:9–7a, on March 14, 1997.

As amended, the challenged game rules provide that the purchaser of a Pick–6 ticket must select, at the time of sale, the method of prize payment. Two choices are provided: (1) an annuity installment option of one initial cash payment and nineteen subsequent yearly installments; or (2) a check in the amount of the estimated present value of the installment option [1]. The selection of method of prize payment made at the time of sale is binding and final. The amended Pick–6 rules also contain a provision stating that voluntary assignment of a prize is "unlawful."

Singer is in the business of buying lottery prize payment streams from prizewinners in a number of states. It is undisputed that, notwithstanding *N.J.S.A.* 5:9–13 [2], New Jersey has been one of those states since December 1993. *N.J.S.A.* 5:9–13 generally prohibits assignment of the right of any person to a State lottery prize, save for payments to the estate of a deceased prize winner, and except "pursuant to an appropriate judicial order."

In *In re Petition of Singer*,[3] a separate opinion rendered today, we have endorsed and expanded upon *McCabe v. Director of New*

---

[1] The record does not disclose what interest assumption is employed to estimate present value or how it may be varied to reflect market rates.

[2] *N.J.S.A.* 5:9–13 provides:

> No right of any person to a prize drawn shall be assignable, except that payment of any prize drawn may be paid to the estate of a deceased prize winner, and except that any person pursuant to an appropriate judicial order may be paid the prize to which the winner is entitled. The director shall be discharged of all further liability upon payment of a prize pursuant to this section.

[3] *In re the Petition of Singer Asset Finance Company, L.L.C., for an Order Allowing a Turnover of Barreca Lottery Winnings Pursuant to N.J.S.A. 5:9–13,* 314 *N.J.Super.* 116, 714 A.2d 322 (App.Div.1998).

*Jersey Lottery Commission,* 143 *N.J.Super.* 443, 448, 363 *A.2d* 387 (Ch.Div.1976), in which Judge Kimmelman held that "a court order sanctioning an assignment of winnings must be circumscribed not only by circumstances of absolute necessity but must not undermine the legislative intent inherent in the State Lottery Law." We held in *In re Petition of Singer* that the legislative intent of *N.J.S.A.* 5:9–13 was to prohibit routine assignments of lottery prize winnings, notwithstanding that an informal practice appears to have developed in at least one vicinage not to follow *McCabe* but regularly to issue orders approving such assignments despite opposition by the Attorney General.

Our opinion in *In re Petition of Singer* may largely render moot Singer's interest in opposing the amended Pick–6 rule. We consider, nonetheless, Singer's several challenges which may be summarized: (1) the lump sum option provided by the amended game rule is arbitrarily inconsistent with a prior Commission argument (adopted as a factor in the *McCabe* opinion) that the State has a *parens patriae* interest to insulate unsophisticated mega-prize winners from their own human frailties as well as from possible predators, by extending payment over a long period of time; (2) the amended Pick–6 Lotto game rule was adopted without compliance with the New Jersey Administrative Procedure Act (*N.J.S.A.* 52:14B–1 to—15)(APA) as required by *N.J.S.A.* 5:9–13.8; and, (3) even assuming that the Pick–6 rule was adopted and amended under authority of *N.J.S.A.* 5:9–7a and b (which relieve lottery game rules and regulations of the nature set forth therein from the requirement of the APA), New Jersey case law independently requires a degree of process to affected parties which was not afforded to Singer.

We find each of the arguments unpersuasive.

The legislative purpose of a 1981 amendment [4] to *N.J.S.A.* 5:9–7, which excluded lottery game rules from being considered adminis-

---

[4] *L.* 1981, *c.* 182, § 1.

trative rules under the APA, was described in the introductory statement to the enacting bill:

> This bill amends the "State Lottery Law" to exclude rules governing lottery games from the jurisdiction of the "Administrative Procedure Act." The change would apply only to rules governing lottery games. Other rules of the Lottery Commission would still be subject to the "Administrative Procedure Act."

As amended, *N.J.S.A.* 5:9–7a provides, in pertinent part:

> Notwithstanding the provisions of any other law to the contrary, no rule or regulation establishing a lottery game shall be considered an "administrative rule" or "rule" pursuant to P.L.1968, c. 410 (C. 52:14B–1 et seq.).

■ The record before us shows that game rules for Pick–6 Lotto were not previously amended under the APA, but under the exemption provided by *N.J.S.A.* 5:9–7 for the rules establishing a lottery game. Thus, the Pick–6 rules existing prior to the March 1997 amendments were adopted without utilizing APA procedures, just as were the challenged amendments. Pick–6 rules did not, and do not, appear in the New Jersey Administrative Code. The Commission's interpretation of *N.J.S.A.* 5:9–7 is entitled to prevail unless plainly unreasonable. *Merin v. Maglaki*, 126 *N.J.* 430, 436–37, 599 *A.*2d 1256 (1992). We note that *N.J.A.C.* 17:20–7.3, which treats with time of prize awards, specifically defers to individual game rules in subparagraph (b): *"Unless the individual game rules provide otherwise*, the payment of prizes to winners who are to be paid in installments shall be made annually . . . ."(Emphasis provided).

The amended Pick–6 game rule challenged by Singer sets down two prize payment schemes. Like the rules respecting type of lottery (*N.J.S.A.* 5:9–7a(1)), prices of tickets (*N.J.S.A.* 5:9–7a(2)), number and size of prizes (*N.J.S.A.* 5:9–7a(3)), manner of selecting winning tickets (*N.J.S.A.* 5:9–7a(4)), and frequency of drawings (*N.J.S.A.* 5:9–7a(6)), the delegated authority to make provision for the amount and nature of prize payments (*N.J.S.A.* 5:9–7a(5)) is clearly part of the Pick–6 Lotto game devised and frequently revised (i.e., "establish[ed]") by the Commission.

■ The ability to choose one of two prize options when buying a ticket is now an integral part of the Pick–6 Lotto game, the rules

for which have frequently been changed by the Commission. The clear legislative purpose of the 1981 amendment to *N.J.S.A.* 5:9–7 was to avoid subjecting details of a particular game, and its ticket costs and prize rewards to the salutary, but cumbersome procedural demands of quasi-legislative rulemaking under the APA. *See N.J.S.A.* 52:14B–4, –4.1 to –4.7.

■ We agree with Singer's argument that mere exemption from APA requirements does not wholly insulate this agency's game rules from appropriate judicial review. *See R.* 2:2–3(a)(2) (providing for review of validity of "any rule"); *George Harms Constr. Co. v. New Jersey Turnpike Auth.,* 137 *N.J.* 8, 19, 644 *A.2d* 76 (1994) (fact that agency action not subject to strict requirements of APA does not mean no process is required); *Carls v. Civil Service Comm'n,* 17 *N.J.* 215, 220–21, 111 *A.2d* 45 (1955) (judicial review of agency rulemaking available by action in lieu of prerogative writs prior to APA, but courts are not to interfere with an agency's discretionary exercise of legislatively delegated power, absent an affirmative showing of arbitrary and capricious exercise).

In performing our duty to review, we must be mindful of a clear expression of legislative intent that the rules of a lottery *game* established by the Commission are not to be regarded in the same way as rulemaking for which APA procedures are mandated. Tested by judicial review, such game rules must nonetheless survive a challenge asserting that they are unreasonable and arbitrary, but that test is here readily met.

The amended Pick–6 rule addresses what are evidently perceived as market needs for a successful Pick–6 lottery. If Singer alone has already discounted over one hundred New Jersey Pick–6 annuities (*see In re Petition of Singer, supra*), a market demand for an alternative to annuity payments may reasonably be assumed and responded to by revising the Pick–6 rules. Moreover, as the records provided by Singer and by the Commission demonstrate, private Internal Revenue Service rulings have already signalled that if lottery annuity prizes are *frequently transferred*

at a discount that is not substantially greater than the prevailing premium for the use of money [5] or if a lottery allows a declared *winner* to decide whether to accept an annuity for years or its present value equivalent, all winners (not merely the winner making the assignment or the present value election) are probably subject to federal taxation of the entire value of their prizes in the year of winning. This is not the case where the election is made at the time of purchasing the lottery ticket. Additionally, the lottery purchaser who elects an immediate pay option must be given a full present value cash payment, rather than being subjected to the vagaries of negotiation with money dealers whose sophistication is apt to exceed that of the lottery winner.

These considerations are alone sufficient to demonstrate to us that the modified Pick–6 game rule is not arbitrary or unreasonable. We appreciate Singer's observation that the changed rule is inconsistent with *parens patriae* policy arguments previously advanced by the Commission respecting assignments of annuity prizes. The Commission was concerned with the perceived need to protect unsophisticated winners from the temptations and vulnerability associated with getting very rich, very fast and very publicly. There may well have been a change of the Commission's view on that issue. We need not resolve the point. There remain sufficient reasonable predicates for adoption of the Pick–6 Lotto game rule amendments under review. They easily survive challenge under the applicable test for unreasonable and arbitrary agency action.

To the extent Singer questions adoption of a cash payment option as inconsistent with the provision of the Commission's rule *N.J.A.C.* 17:20–7.3(d) which prohibits acceleration of prize awards, we note that the amended rule does not accelerate payment of any

---

[5] It would appear that routine pro-forma judicial approvals of annuity assignments at discount rates deemed fair by the court render Pick–6 prizes prime candidates for such characterization by the I.R.S.

prize already won. It provides for a cash prize election at the time the ticket is purchased.

In other words, the lottery ticket buyer may opt to play for a cash prize. There is no acceleration. Under *In re Petition of Singer*, there will be no routine third-party assignments of annuity winnings requiring costly monitorship by New Jersey courts and the Attorney General, nor routine partial assignments requiring continued administration by the Lottery Commission, unless expressly authorized by the Legislature.

We note that the amended Pick–6 rule states in part:

12. Voluntary assignments of lottery prizes are unlawful.

Standing alone, this provision would not survive the argument that it is not part of "establishing" the Pick–6 game. However, the provision does not stand alone as a quasi-legislative agency rule. Rather, it merely reflects the statutory policy enunciated in *N.J.S.A.* 5:9–13 as construed in *In re Petition of Singer*, and earlier, in *McCabe*. This is evidenced by use of the word "unlawful," connoting a violation of statute. Needless to say, the regulation must be enforced consistently with the interpretation of *N.J.S.A.* 5:9–13 set forth in *In re Petition of Singer*.

■ Singer complains of the inadequacy of notice of the Commission's intent to modify the Pick–6 game rules. However, the notice provided by the Commission complies with the Open Public Meetings Act notice requirements. *See N.J.S.A.* 10:4–6 to –21. The meeting was open to the public. Singer could have attended and made its views known, or even attended both to make its views known and to ask for additional time to supplement those views. It did not do so.

■ Given the long-standing published interpretation of *N.J.S.A.* 5:9–13 rendered in *McCabe, supra*, and reaffirmed by us in *In re Petition of Singer* today, Singer's interest in the amended game rule was, and is, extremely tenuous at best. Indeed, the extent of Singer's right to question the rules of a lottery game would be limited, even if the routine annuity assignments were

lawful. A game rule extending the possibility of receiving immediate cash payouts, already provided for winners of other lottery games run by the Commission, to Pick–6 Lotto ticket purchasers implicates no property or liberty interest of Singer requiring protection by this court, beyond compliance with the requirements of the Open Public Meetings Act.

■ Finally, we must address one aspect of the amended Pick–6 Lotto game rules which requires further action in the public interest. In respect of the cash option, the rules provide only that "the winner shall receive a check in payment of the prize *estimated* to be the present value of the installment option." (Emphasis added). This is facially inadequate to inform the ticket purchaser how the estimate will be fixed. Presumably the "estimate" will be made by the Commission. The rules must clarify both the source of the estimate and the interest assumption which will be utilized to fix present value of the installment option. The interest assumption may or may not vary with the market. If fixed, the percentage must be disclosed. If variable, the benchmark for fixing it, such as, for example, the current thirty-year United States Government Bond rate or similar generally publicized interest rate source, must be announced in the rule.

The amendments to the Pick–6 Lotto rules, adopted by the Commission on March 14, 1997 are declared lawful and valid. We direct the Commission, however, forthwith to modify the game rules, subject to public notice, but without the necessity for APA compliance, to set forth the basis used for calculation of present value.

We do not retain jurisdiction.